## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KENNETH SMITH<br>743 Park Rd. NW<br>Washington, DC 20010<br><br>and<br><br>L. KENT FOWLER<br>1914 11th St. NW<br>Washington, DC 20001<br><br>*Individually, and on behalf of a class of similarly situated persons*,<br><br>                Plaintiffs,<br><br>    v.<br><br>PHH MORTGAGE CORPORATION D/B/A<br>PHH MORTGAGE SERVICES,<br>2000 Midlantic Dr., Suite 410-A<br>Mount Laurel, NJ 08054<br><br>                Defendant. | Case No. 1:25-cv-00371<br><br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Kenneth Smith and L. Kent Fowler, individually and on behalf of all others similarly situated, bring this class action against Defendant PHH Corporation d/b/a PHH Mortgage Services ("PHH"), alleging (1) violations of the Fair Debt Collection Practices Act ("FDCPA") and (2) violations of the District of Columbia Consumer Protection Procedures Act based on PHH's collection of unauthorized pay-to-pay and payoff quote fees and seeking declaratory relief from the unenforceable purported Note Amendment to Mr. Smith's mortgage and for those similarly situated.  (Mr. Fowler is not subject to the purported *McWhorter* Note Amendment.)

### NATURE OF THE ACTION

1.      PHH is one of the country's largest servicers of residential mortgages. For years,

PHH has raked in millions of dollars in profit by unfairly and illegally up-charging borrowers for routine mortgage servicing activities.

2.      PHH is a recidivist wrongdoer. Federal and state regulators have repeatedly taken action against PHH (and its predecessor, Ocwen Loan Servicing) for abusing and stealing from borrowers—through allegedly paying mortgage insurance kickbacks,[1] falsely certifying that mortgages satisfied requirements for mortgages insured by the Department of Housing and Urban Development, Federal Housing Administration, and Department of Veterans Affairs,[2] and botching basic servicing tasks.[3]

3.      PHH's pattern of misconduct against borrowers has continued through today and includes charging illegal fees.

4.      PHH, a frequent acquirer of servicing rights for mortgages in default, routinely violates the Fair Debt Collection Practices Act ("FDCPA") and D.C. Consumer Protection Procedures Act ("CPPA") by charging and collecting illegal fees that are not authorized in borrowers' standard mortgages ("Uniform Mortgages") or permitted under law.

5.      Specifically, PHH charges improper fees when borrowers request payoff statements to satisfy their loans, refinance, or understand what sums PHH believes it is owed ("Payoff Statement Fees"). These fees are merely junk fees added unfairly and deceptively to borrowers' accounts; they are not expressly authorized by law or the Uniform Mortgages.

---

[1] Consumer Financial Protection Bureau, *CFPB Takes Action Against PHH Corporation for Mortgage Insurance Kickbacks* (Jan. 29, 2014), https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-phh-corporation-for-mortgage-insurance-kickbacks/.
[2] Department of Justice, *PHH Agrees to Pay Over $74 Million to Resolve Alleged False Claims Act Liability Arising from Mortgage Lending* (Aug. 8, 2017), https://www.justice.gov/opa/pr/phh-agrees-pay-over-74-million-resolve-alleged-false-claims-act-liability-arising-mortgage.
[3] Attorney General of Texas, *AG Paxton and 48 States Reach $45 Million Settlement with PHH Mortgage Corporation* (Jan. 3, 2018), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-and-48-states-reach-45-million-settlement-phh-mortgage-corporation.

6.      Similarly, PHH charges egregious "convenience fees" or "processing fees" (collectively, "Pay-to-Pay Fees") of up to $19.50 every time a borrower makes their mortgage payments online or by phone—a basic mortgage servicing function that costs PHH less than a dollar to provide. Like the fees charged for a payoff statement, Pay-to-Pay Fees are not permitted by their Uniform Mortgages or by applicable law.

7.      Any reliance PHH places on a previous class action settlement that purportedly amended borrowers' mortgages to greenlight continued Pay-to-Pay Fees runs afoul of the statute of frauds and DC consumer law.

8.      Mortgage borrowers like Plaintiff Smith and Plaintiff Fowler do not have the right to choose their loan servicer and obtain a better deal or better treatment. They have no way to avoid PHH's outrageous fees and poor treatment. Meanwhile, they are already compensating PHH for its servicing work; the interest and other, legal fees paid as part of their mortgage loan are intended to and do cover the costs associated with servicing it. The creditor who selected PHH to be the assignee of its servicing rights pays PHH fees for all the mortgages it processes. Yet PHH burdens borrowers like Plaintiffs with additional fees and costs simply to inflate its own profits, knowing borrowers have no other options.

9.      Plaintiffs therefore bring this class action lawsuit to recover the illegal Payoff Statement and Pay-to-Pay Fees they and other similarly situated borrowers paid and to obtain declaratory relief from the unenforceable efforts to amend Plaintiffs' mortgage notes through the settlement of  class action.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because diversity exists between PHH and at least one class member and the matter in controversy exceeds $5,000,000, and pursuant to 28 U.S.C. § 1331.

11. This Court has personal jurisdiction because PHH has significant contacts through its business in the District of Columbia, commits torts and statutory violations in the District of Columbia, and holds a Mortgage Dual Authority License in the District of Columbia.

12. Venue is proper because a substantial portion of the events alleged herein occurred within this District.

## PARTIES

13. Plaintiff Smith is a natural person residing in the District of Columbia. His mortgage loan has been serviced and/or subserviced by PHH, or its predecessor in interest, Ocwen Loan Servicing, LLC, since at least 2018. A copy of his mortgage agreement is attached as EXHIBIT A.

14. Plaintiff Fowler is a natural person residing in the District of Columbia. His mortgage loan has been serviced and/or subserviced by PHH, or its predecessor in interest, Ocwen Loan Servicing, LLC, since approximately 2014. A copy of his mortgage agreement is attached as EXHIBIT B.

15. PHH is a New Jersey corporation with a principal place of business in New Jersey.

16. PHH enters into service agreements with lenders, note holders, master servicers and trustees pursuant to which PHH provides servicing, subservicing, and agency activities for loan portfolios, including receiving scheduled periodic payments Plaintiffs' mortgage loan and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

17.    PHH is one of the largest mortgage servicers in the country and operates on a nationwide basis.

18.    PHH often performs subservicing in which it performs its servicing duties under the name of master servicer or lender. A borrower may not even realize that PHH is subservicing their loan as the master servicer's name and logo appears prominently on the monthly statement and other correspondence while PHH's name may appear as "c/o PHH Mortgage Services" smaller font. However, PHH is responsible for interacting with borrowers, and processing payments. PHH does not disclose the terms of its servicing agreements publicly.

19.    PHH represents in standard, form letters to Plaintiff and other borrowers that, "PHH Mortgage Services will perform all servicing activities for your mortgage loan." PHH mails standard, form mortgage statements and notice letters to Plaintiff and Class members with the approval and authority of its lender, note holder, and/or trustee principals.

20.    PHH frequently acquires servicing rights in mortgages that are, or that it considers to be, more than 30 days delinquent and/or otherwise in default and regularly collects or attempts to collect on those mortgages on behalf of the holder of the mortgage note.

## FACTUAL ALLEGATIONS

### A.    Background on the Mortgage Servicing Industry

21.    The residential mortgage lending industry is generally divided between two types of loans: conforming and non-conforming. The vast majority of loans are "conforming" loans, in that they "conform" with particular uniform terms and conditions, and are for amounts under a certain threshold, set by the Federal Housing Finance Agency in coordination with Federal National Mortgage Association ("FNMA" or "Fannie Mae") and the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"). FNMA and FHLMC are federally chartered

corporations and are known as Government-Sponsored Enterprises ("GSEs"). In 2021, that funding threshold was $528,250 in many places, and up to $970,800 in higher cost-of-living areas. Loans that do not conform to these standards are typically "jumbo" loans and require more specialized underwriting due to the higher value of the property securing the mortgage.

22.    Conforming loans include both government loans (*i.e.*, those insured by the Federal Housing Administration, Veterans' Administration, or the U.S. Department of Agriculture), and conventional loans. Conforming loans must "conform" to the nationwide standards set by the GSEs, which purchase them to sell as pooled securities in the secondary market. To ensure ease of securitization, the GSEs create standard mortgage and deed of trust templates for all conventional loans, and the government agencies' templates are modeled after those GSE templates. While these templates contain sections for language that incorporates state requirements, that language is also standardized.

23.    Because the conforming lending process depends on standardization, all borrowers go through the same process to obtain a conforming loan. Mortgage lenders typically use industry software to generate the standardized templates and complete the templates with the borrowers' information. Once approved to borrow the funds, the borrowers execute these standard loan documents. Because the GSEs will accept for securitization only those loans that adhere to their standard loan documents, a lender cannot add additional terms and there is no room for negotiation of any kind.

24.    After the mortgage or deed of trust agreement is finalized, the mortgage lender often sells the mortgage to the GSEs, which in turn bundle it with other conforming loans to sell as securities to investors in the form of a mortgage-backed security—a bond-like security that is secured by the mortgaged property. While the original mortgage lender may itself service the

securitized and pooled loan, often that lender or the GSEs to which the loan is sold (collectively "Holders") will assign a large mortgage servicing company the rights to service the mortgages. That company may in turn contract with one or multiple subservicers. These servicers (whether master servicers or subservicers (collectively "Servicing Companies" or "Servicers")) specialize in the management and administration of mortgages and perform the servicing obligations required by the Standard Mortgages.

1.    **Mortgage Lenders and Note Holders Retain Mortgage Servicers Like PHH to Accept Payments and Collect Mortgage Debt from Borrowers.**

25.    As part of the contractual or assignment process, the Holder assigns the servicer various rights and responsibilities under the standard mortgage agreements, and the servicer and the Holder negotiate a fee schedule under which the Holder will compensate the servicer for collecting payments and other servicing and collections work. Where a servicer enlists a subservicer, the same process applies. As a result, rather than paying the Holder directly, borrowers are instructed to submit their mortgage payments to a Servicing Company, who later splits those payments between itself, any master servicer involved, and the Holder pursuant to the agreed upon fee schedule.

26.    The fees paid to mortgage servicers or subservicers by the lender or GSEs come in a variety of forms. ***First,*** as with any loan, a portion of the interest a borrower pays on their mortgage goes to cover the cost of collecting that loan, and Servicing Companies negotiate a servicing fee for each mortgage serviced. The servicing fee is typically a fixed percentage of the borrower's outstanding mortgage balance on an annual basis, usually in the .25-.5% range. For example, if a Servicing Company agrees to perform work for .5% of the borrowers' balance, and a borrower has a $223,952 balance on their mortgage (which was the average mortgage balance in the United States at the end of 2021), the Servicing Company receives $1,119.76 a year, or $93.31

a month, to accept the payment from the borrower and apply it to the balance. ***Second,*** the Holder the servicing company to which it assigns servicing rights can agree to a fee schedule by which other incidental revenue from the borrower gets allocated between them. For example, the standard mortgage agreement specifies certain kinds of fees, such as late fees, and these agreements usually specify which party (i.e., the Holder or the servicer) can keep those fees. Likewise, the various companies involved may agree as to how interest on borrowers' escrow payments is shared.

27.     Consumer borrowers have no role in the selection of the Servicing Companies or the way any company in the chain agree to split fees. Because the borrower's payment obligations are set out in the standard mortgage agreement, the borrower's out-of-pocket costs, in theory, should not be impacted by the Holder's choice of servicer and the involvement of any subservicer. And the standard mortgage agreement does not impose any obligation to pay for loan servicing beyond the mortgage payment, interest, and certain limited fees.

**B.     PHH charges illegal payoff Statement fees in violation of the Fair Debt Collection Practices Act and D.C. Consumer Protection Procedures Act.**

28.     PHH is a Servicing Company, providing both servicing and subservicing of conforming, residential mortgages, and operates nationwide. PHH buys mortgage servicing rights or contracts and exercises those mortgage servicing rights to collect mortgage payments, charge fees, enforce the mortgage or deed of trust and note, as well as initiate foreclosure on properties that secure the mortgage or deed of trust and note.

29.     As a result of its growth, PHH has become one of the largest servicers of residential mortgages in the country, and it routinely violates the Fair Debt Collection Practices Act ("FDCPA") and various state debt collection and consumer protection laws (including D.C.'s), and breaches the uniform terms of borrowers' mortgages ("Uniform Mortgages") by charging and collecting illegal payoff statement fees when borrowers request payoff statements to satisfy their

loans or understand what sums PHH claims it is due ("Payoff Statement Fees").

30.    As part of PHH's regular business practice of acquiring servicing rights to mortgages, it acquires mortgages in default for purposes of servicing them, including collecting payments on that mortgage debt both during the time the mortgage is in default and after it has been brought current.

31.    Borrowers require and request payoff statements for a number of reasons, including sale or refinance, and provision of payoff statements by PHH has nothing to do with protecting its interests in the underlying property, whether or not the loan is in default.

32.    Each time a mortgage borrower whose loan is serviced by PHH requests a payoff statement for their loan, and sometimes even when a borrower does not request the payoff statement, PHH imposes, charges, and/or collects one or more Payoff Statement Fees of approximately $30.

33.    The payoff amount disclosed on the payoff statement is data that can be electronically extracted from mortgage servicing platforms, quickly and inexpensively.  Upon information and belief, the cost to PHH to prepare a payoff statement is significantly less than $30.

34.    The actual cost to PHH to prepare payoff statements is part of its standard mortgage servicing functions, mandated by the Truth in Lending Act ("TILA"), for which PHH is compensated by the creditor.  *See* 15 U.S.C. § 1639g, 12 C.F.R. § 1026.26(c)(3).

35.    The Payoff Statement Fees subject to this action are nothing more than junk fees added unfairly and deceptively to the accounts of mortgage borrowers and thousands of other consumers by PHH, as they are not expressly authorized by either federal or state law or standard loan documents.

36.    Indeed, Regulation X, the implementing regulation for the Real Estate Settlement

9

Procedures Act ("RESPA"), specifically *prohibits* the imposition of any fee for provision of a statement required by TILA, as payoff statements are.  *See* 12 C.F.R. § 1024.12.

37.     In addition, DCMR § 26-C11, a regulation falling under the D.C. Mortgage Lender and Broker Act ("MLBA"), authorizes only "fees that are reasonable and for services actually performed by the licensee or a third party providing services on behalf of the licensee." *Id.* § C1118.2.

38.     Payoff Statement Fees are not found in the Uniform Mortgage documents at all, in contrast to late fees or fees for services in connection with the protection of a lender's security interest that are expressly referenced.

39.     Of the states in which PHH charges borrowers Payoff Statement Fees, the laws of 13 of those states—including include Alaska, Arkansas, D.C., Florida, Montana, New Mexico, Ohio, Oklahoma, Pennsylvania, Rhode Island, Virginia, Washington, or Wyoming—likewise include no express authorization for the assessment of Payoff Statement Fees, and in some cases explicitly prohibit them.

40.     As a pure mortgage servicer, PHH is generally not a party to the Uniform Mortgage documents between the borrower and the owner of the loan like Freddie Mac. It is simply a third-party vendor or debt collector retained by the owner or insurance provider for the loan with no rights to alter the Uniform Agreements unless agreed to by all parties in a written and countersigned agreement.

**C. PHH Illegally and Unfairly Double-Charges Consumers When They Remit Payment Online or Over the Phone**

41.     As a servicing company, one of PHH's major responsibilities is to accept mortgage payments. The Uniform Mortgage documents require the Holder or Servicer to accept payment via check or money order at a designated location.

42.     While PHH, like all Servicing Companies, is required to accept payments by check under the Uniform Mortgage Agreements, accepting payments in this form is expensive. It can cost anywhere between $1 and $4 a month in processing and other fees, per a 2022 report by the Association for Financial Professionals.[4] Every check needs to be opened, reviewed, keyed into the computer system to apply to the loan, and deposited. Delays in postal operations and the high risk of human error generate customer service calls and require internal checkpoints and increased oversight. Borrowers who are concerned about the timeliness of the payment may call to ensure it was received and properly credited, adding to the customer service work associated with this routine part of servicing.

43.     Because of the costs associated with accepting paper checks, servicing companies earn more money per payment if they can persuade borrowers to remit payment via electronic funds transfer, which often costs as little as only a few cents. Generally, EFTs take two main forms.

44.     *First*, EFTs may be pre-authorized, reoccurring EFTs, whereby the borrower authorizes the servicing company to debit each month a pre-determined amount of money from their account on a pre-determined date. This form of payment typically costs servicing companies a few cents per transaction. While servicing companies may accept payment in this manner, they are prohibited from requiring borrowers to repay their mortgages in this manner. The federal Electronic Funds Transfer Act prohibits lenders from "condition[ing] the extension of credit" on a borrower's willingness to repay the loan "by means of preauthorized electronic fund transfers." 15 U.S.C § 1693k(1).

45.     *Second*, EFTs may be standard EFTs, whereby the borrower authorizes only a single debit at a time. A borrower paying via standard EFT could remit payment via electronic

---

[4] https://www.afponline.org/docs/default-source/registered/2022-afp-payments-cost-survey-highlights.pdf

funds transfer on the date of their choosing by using a payment form on the servicer's website, by phone, or via an interactive voice recorded ("IVR") phone call, through which a borrower can provide bank account information and authorize the electronic payment. Standard EFTs typically cost Servicing Companies like PHH less than 50 cents a transaction, far less than the cost of paying by check, and like the pre-authorized EFTs, include increased electronic efficiencies. The Association for Financial Professionals wrote a report in 2022 stating that the median cost for processing these transactions was between 37 and 75 cents, much less than its estimated check processing costs of $1 to $4.[5]

46.     While PHH, like all servicing companies, saves the most money, and thus, profits more, when borrowers agree to submit payment via pre-authorized EFTs, it knows that it cannot mandate that borrowers pay this way. And PHH knows that many borrowers will find preauthorized reoccurring EFTs inconvenient or impractical, as it requires that one agree to a fixed amount and date for the debit each month out of a pre-determined bank account, and increases a borrower's vulnerability to banking errors. Many borrowers have various budgetary needs that cause them to need more control over their finances. For example, borrowers are often paid on different dates of a given month, and since there is a fifteen-day grace period before a monthly payment is deemed late, borrowers may need to make their monthly payment on a schedule that coincides with their paydays, which may not be the same calendar day each month. Some may pay extra on their mortgage at times and need to make that decision on a monthly basis. Others may be sharing responsibility for paying the mortgage with another person, and funds to pay it come from multiple bank accounts.

47.     Because the cost of accepting paper checks is high, and accepting payment via EFT

---

[5] *See supra* n.4.

is low, servicing companies, including PHH, can reduce costs and increase profits if they can persuade the group of borrowers who do not consent to pre-authorized EFTs to pay via standard EFTs instead of by check. Thus, many servicers, including PHH, offer borrowers the option of authorizing payment via a standard EFT on a month-by-month basis.

48.    While PHH already profits when it persuades borrowers to pay in ways that do not require PHH to process a check, PHH exploits borrowers' financial vulnerabilities by charging borrowers to process their own transactions at a huge markup. Each time a borrower whose loan is serviced by PHH makes a payment via standard EFT, PHH charges the borrower a Pay-to-Pay Fee of up to $7.50.

49.    These Pay-to-Pay Fees are materially higher than the costs incurred by PHH, and can add up to hundreds of dollars over the life of a single loan, and provide millions of dollars in profits for PHH. PHH's imposition of Pay-to-Pay Fees also amounts to a form of double-charging. It charges the Pay-to-Pay Fees over and above its negotiated servicing fees agreed with the Holder and any master servicer.

50.    When PHH negotiates a servicing fee, it does so knowing that (1) it cannot require any borrower to remit payments exclusively by a pre-authorized EFT; and (2) it may have to incur the higher cost of payment by check for every single borrower whose account PHH services. Thus, when negotiating and charging a given service fee, PHH knows that it must charge a rate that is high enough to cover its servicing costs, including the costs of accepting payment by check, while allowing it to turn a profit. Using the example in paragraph 25, where PHH negotiates a .5% servicing fee, the borrower of an average U.S. mortgage compensates PHH $93.31 a month to accept their payment, regardless of how they remit payment. In that instance, should the borrower invoke their right to pay by check, PHH could incur as much as $4 in costs to process check

payments, leaving $89.31 to cover other overhead costs and for its own profit. By offering the borrower the option to pay via a standard EFT, PHH can keep a few more dollars of the borrower's money. But PHH goes one step further. It also charges the borrower extra fees—of up to $19.50 per payment—when they make the payment.

51.    PHH may purport to be providing a valuable service to borrowers to which they would not otherwise be entitled. But PHH has no incentive to stop offering standard EFTs to borrowers, because if it did, PHH would have to process more checks at a much higher cost.

52.    PHH's preference for processing payments via standard EFT rather than via a paper check is plain from its own instructions to borrowers in monthly statements. PHH admits that it may not actually process the checks it receives as checks, but rather, converts them to a standard EFT:

> When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account, or to process the payment as a check transaction. . . . If you would like to opt out of this program or if you have any questions, please call us at the phone number shown on the front of this statement.

In other words, PHH does not deposit the check at its bank and then wait several days for the check to clear. Rather, when a borrower mails it a check, PHH uses the borrower's bank account number and routing number on the bottom of the check to electronically debit the borrower's bank account over the ACH network, resulting in the payment clearing in about a day.

53.    Because processing a check as an EFT transaction will clear faster, it is less likely to incur the customer service costs associated with the acceptance of checks, and thus is less expensive, but because there is still some delay time and more risk of human error, this method is still more expensive than processing a standard borrower-initiated EFT. It is implausible that PHH would stop allowing borrowers to enter their bank account information if it could not charge them to do so, and instead assume the added expense of doing that work itself. Indeed, although PHH

agreed, in settling a similar class action lawsuit involving California borrowers, to cease charging those borrowers Pay-to-Pay Fees, it continues to offer those borrowers the option of paying via standard EFT (free of charge), presumably because allowing customers this payment option is financially beneficial for PHH.

54.    If PHH wants to make more money, it can negotiate a larger fee from the Holder or master servicer. It should not get to double dip—pocketing the servicing cut while upcharging borrowers for doing the work they have already been paid to do. PHH gets away with these illegal Pay-to-Pay Fees because borrowers cannot choose another mortgage servicer or shop around for a better deal. Borrowers are forced to have PHH service their loan.

**1.    PHH Has Collected Pay-to-Pay Fees Based on an Unenforceable Amendment to Plaintiff Smith's Mortgage**

55.    In 2014, consumers brought a class action against Ocwen Loan Servicing, LLC challenging its practice of assessing Pay-to-Pay Fees. *McWhorter v. Ocwen Loan Servicing, LLC*, Case No. 2:15-CV-01831-MHH (N.D. Ala.).

56.    In 2019, the Alabama federal district court approved a settlement including, *inter alia*, a "Note Amendment" purporting to amend the loan documents of each class member whose loans were serviced by Ocwen on and after June 1, 2018, including Plaintiff Smith, to expressly authorize Ocwen to accept Pay-to-Pay Fees. *Id.* at ECF Nos. 49-1, 71, 2019 WL 9171207 (N.D. Ala. Aug. 1, 2019).

57.    Ocwen acquired PHH on October 4, 2018.

58.    PHH's effort to amend mortgage notes en masse failed in a subsequent class action regarding Pay-to-Pay Fees. *See Morris v. PHH Mortgage Servicing Corp.*, No. e 0:20-cv-60633-RS (S.D. Fla.). Though the original proposed settlement in that case would have proffered note amendments similar to those in *McWhorter*, in January 2021, a coalition of 33

state attorneys general, including the Attorney General for the District of Columbia, intervened to object to the settlement in large part because of the note amendment and its implications under the applicable statutes of frauds. The parties amended the settlement to remove the note amendment provision. *Id.* at ECF No. 178-1.

59. The D.C. Statute of Frauds requires that agreements, memoranda or notes thereof, concerning real estate must be in writing and signed by the party to be charged therewith or a person authorized by them, and such requirements therefore apply to mortgage loans agreements and any settlement agreements purporting to amend mortgage loan agreements. D.C. Code Ann. § 28-3502.

60. The DC power of attorney statute states: "A power of attorney shall be signed by the principal or in the principal's conscious presence by another individual directed by the principal to sign the principal's name on the power of attorney. . . . A power of attorney executed under this chapter is not valid unless it is acknowledged before a notary public or other individual authorized by law to take acknowledgment." D.C. Code § 21-2601.05. Further, "if a power of attorney authorizes the agent to sell, grant, or release any interest in real property, it shall be executed in the same manner as a deed and shall be recorded with or prior to the deed executed pursuant to the power of attorney. …." D.C. Code § 21-2603.03.

61. The facts and circumstances surrounding the *McWhorter* settlement do not satisfy the requirements of §§ 21-2601.05 and 21-2603.03.

62. Purported amendments to mortgage contracts that do not satisfy the requirements of the D.C. Statute of Frauds and other applicable legal standards are unenforceable and cannot expressly authorize fees not otherwise provided for by law.

63. Nevertheless, PHH collected these fees, failing to disclose that the fees were not

authorized.

64.    PHH also failed to disclose that these fees far exceeded the actual cost to process the transaction.

65.    PHH represented to borrowers that the illegal and unenforceable Note Amendment authorized PHH to charge Pay-to-Pay Fees.

66.    PHH acted deceitfully by relying on the unenforceable Note Amendment to assess from Plaintiffs more in Pay-to-Pay Fees than it actually disbursed to process to Pay-to-Pay transactions.

## PLAINTIFF SMITH'S ALLEGATIONS

67.    On or about March 27, 2006, Plaintiff Smith obtained a mortgage loan for his primary residence located at 743 Park Road, NW, Washington, D.C. 20010. Plaintiff executed a Uniform Mortgage agreement ("Smith Mortgage Agreement").

68.    The Smith Mortgage Agreement, as a Uniform Mortgage agreement, does not contain authorization for Payoff Statement Fees or Pay-to-Pay Fees.

69.    In or before 2021, PHH began servicing Plaintiff Smith's loan.

70.    At the time of servicing transfer, Plaintiff Smith's mortgage was considered to be default.

71.    At no time was Plaintiff Smith provided an opportunity to select his servicer; rather the decision to assign PHH servicing rights was made exclusively by his lender and/or master servicer.

72.    On or about May 5, 2022, and August 4, 2022, Plaintiff Smith made payments by phone. For each such payment, PHH collected from Plaintiff Smith $7.50 in Pay-to-Pay Fees, and Plaintiff Smith paid the Pay-to-Pay Fees at the time he made the mortgage payments to which the

fees applied.

73.    Plaintiff Smith never signed any Note Amendment purportedly made pursuant to the *McWhorter* settlement.

74.    In or around early February 2024, Plaintiff Smith requested a Payoff Statement from PHH in order to explore options for his mortgage.  On or about February 7, 2024, PHH charged him a Payoff Statement Fee of $30.

75.    In a letter dated July 15, 2024, Plaintiff Smith notified PHH about the violative service fees and demanded that it cure the violations on behalf of the putative classes.

76.    In a response letter dated August 8, 2024, PHH acknowledged a variety of costs and fees it assessed Plaintiff Smith—including the February 7, 2024 Payoff Statement Fee—but claimed such fees were authorized by the mortgage agreement.

**PLAINTIFF FOWLER'S ALLEGATIONS**

77.    On or about June 14, 2004, Plaintiff Fowler obtained a mortgage loan secured by his primary residence, located at 1914 11th Street, NW, Washington, D.C. 20001. Plaintiff Fowler executed a Uniform Mortgage agreement ("Fowler Mortgage Agreement").

78.    Plaintiff Fowler was not included in the *McWhorter* settlement or any other settlement that purported to amend his mortgage note, and the Fowler Mortgage Agreement was a Uniform Mortgage that did not provide for the collection of Pay-to-Pay Fees.

79.    In or before 2021, PHH began servicing Plaintiff Fowler's loan.

80.    At no time was Plaintiff Fowler provided an opportunity to select his servicer; rather the decision to assign PHH servicing rights was made exclusively by his lender and/or master servicer.

81.    Plaintiff Fowler made his monthly mortgage payment by phone and web, including

on or about March 1, March 15, April 15, May 16, July 1, July 29, August 15, September 30, October 17, and November 30, 2022. For each such payment, PHH collected from Plaintiff Smith $7.50 or $15.00 in Pay-to-Pay Fees each time, and Plaintiff Fowler paid the Pay-to-Pay Fees at the time he made the mortgage payments to which the fees applied.

## CLASS ACTION ALLEGATIONS

82.    Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiffs bring

this class action on behalf of themselves and all those meeting the following class definitions:

**Multistate FDCPA Payoff Statement Fee Class:** All persons (1) with a residential mortgage loan securing a primary residence property in the United States, (2) serviced or subserviced by PHH and acquired when such loan was 30 days or more delinquent, (3) with a Uniform Mortgage agreement incorporating covenants from Fannie Mae/Freddie Mac, FHA, or similar government-backed model mortgages; (4) who reside in Alaska, Arkansas, D.C., Florida, Montana, New Mexico, Ohio, Oklahoma, Pennsylvania, Rhode Island, Virginia, Washington, or Wyoming; (5) whose mortgage account was assessed a Payoff Statement Fee by PHH.

**D.C. Payoff Statement Fee Class:** All persons (1) with a residential mortgage loan securing a primary residence property in the District of Columbia, (2) serviced or subserviced by PHH, (3) with a Uniform Mortgage agreement incorporating covenants from Fannie Mae/Freddie Mac, FHA or similar government-backed model mortgages, (4) whose mortgage account was assessed a Payoff Statement Fee by PHH.

**D.C. Pay-to-Pay Fee Damages Class:** All persons (1) with a residential mortgage loan securing a primary residence property in the District of Columbia, (2) serviced or subserviced by PHH, (3) with a Uniform Mortgage agreement incorporating covenants from Fannie Mae/Freddie Mac, FHA or similar government-backed model mortgages, (4) whose mortgage account was assessed a Pay-to-Pay Fee by PHH.

**D.C. Pay-to-Pay Fee Declaratory Judgment Class:** All persons (1) with a residential mortgage loan securing a primary residence property in the District of Columbia, (2) serviced or subserviced by PHH, (3) with a Uniform Mortgage agreement incorporating covenants from Fannie Mae/Freddie Mac, FHA or similar government-backed model mortgages, (4) whose mortgage account was assessed a Pay-to-Pay Fee by PHH in connection with a phone or web payment, (5) for which a purported Note Amendment arising from the *McWhorter* or any other class action settlement supposedly authorized the charge of Pay-to-Pay Fees, and (6) such Note Amendment was not signed by the borrower or anyone acting with power of

attorney on behalf of the borrower.

83.    Plaintiffs reserve the right to modify or amend the definition of the Classes before the Court determines whether certification is appropriate.

**A.    Numerosity (Rule 23(a)(1))**

84.    The proposed Classes are so numerous that joinder of all members would be impracticable; PHH services hundreds of thousands of loans. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by PHH. The precise number of Class members can be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**B.    Commonality (Rule 23(a)(2))**

85.    There are core questions of law and fact that are common to Plaintiffs' and Class members' claims.

86.    These common questions predominate over any questions that go particularly to any individual member of the Classes. Among such common questions of law and fact are the following:

a.    Whether the Payoff Statement Fees charged to class members were prohibited by law.

b.    Whether the Pay-to-Pay Fees charged to class members were prohibited by law.

c.    Whether Class members' loan agreements prohibited Payoff Statement Fees;

    d.      Whether Class members' loan agreements prohibited Pay-to-Pay fees;

    e.      Whether PHH exceeded its authority under Class members' loan agreements and violated state and federal law by collecting or attempting to collect Payoff Statement or Pay-to-Pay Fees;

    f.      Whether Plaintiff and the Classes are entitled to restitution, damages, and/or non-monetary relief;

    g.      Whether Plaintiff and the Classes are entitled to attorney's fees and costs; and

    h.      The appropriate remedies due by PHH to Class members.

## C.    Typicality (Rule 23(a)(3))

87.    Plaintiffs are members of the Classes they seek to represent. Plaintiffs' claims are typical of claims of the other Class members because of the similarity, uniformity, and common purpose of PHH's unlawful conduct. Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of PHH's unlawful conduct.

## D.    Adequacy of Representation (Rules 23(a)(4) and 23(g))

88.    Plaintiffs are adequate representatives of the Classes and will fairly and adequately protect the interests of the Classes. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent him. There is no hostility between Plaintiffs and the unnamed Class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

89.    To prosecute this case, Plaintiffs have chosen the undersigned law firms, who are experienced in class action litigation, fraud litigation, and mortgage litigation, and who have the financial and legal resources to meet the substantial costs and legal issues associated with this type

of litigation.

**E.     Predominance and Superiority (Fed. R. Civ. P. 23(b)(3))**

90.     The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed Class members are based on PHH's common unlawful conduct based on uniform policies involving standardized (and form) mortgage documents.

91.     Moreover, common questions of law predominate, including whether the assessment of Payoff Statement and Pay-to-Pay Fees violates the mortgage agreements and are assessed in bad faith.

92.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even though some individualized damages determinations may be necessary.

93.     A class action is superior to individual actions.

94.     Joinder of all Class members would create extreme hardship and inconvenience for the affected borrowers as they are dispersed geographically and reside across multiple states.

95.     Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions.

96.     There are no known individual Class members who are interested in individually controlling the prosecution of separate actions. The interests of justice will be well served by resolving the common disputes of potential Class members in one forum. Individual suits would not be cost effective or economically maintainable, and the action is manageable as a class action.

**F.     Requirements of Fed. R. Civ. P. 23(b)(2)**

97.     Prosecuting separate actions by or against individual Class members would create

a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Classes.

98.      PHH acted or failed to act in a manner generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**COUNT I**

**VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT**

**Payoff Statement Fees**

**15  U.S.C. § 1692k** *et seq.*

**(On Behalf of Plaintiff Smith and the Multistate Class)**

99.      All prior and subsequent paragraphs are hereby incorporated by reference.

100.      Plaintiffs and the Class members are "consumers" as defined by 15 U.S.C. § 1692a(3) because Plaintiff Smith and the Class members purchased homes using mortgages primarily for personal, family, or household use.  Plaintiff Smith's mortgage was for his personal residence.

101.      PHH is a "debt collector" as defined by 15 U.S.C. § 1692a(6) because it regularly attempts to collect, and collects, amounts owed or asserted to be owed or due another, *i.e.*, the holders of the mortgage debts. PHH also regularly acquires mortgage loans that are in default, and as such, is in the business of collecting on defaulted debt.

102.      PHH acquired the rights to service and collect payments on the mortgage debt of Plaintiff Smith while his mortgage was in arrears or default, and regularly collected loan payments on behalf of Plaintiff Smith's lender, which were due monthly. As to all members of the Class, PHH acquired servicing rights to their Uniform Mortgages while in default, and

regularly collected loan payments on behalf of these Class members' lenders, which were due monthly.

103.    In the course of collecting the mortgage debts it acquired in default, when PHH collected Payoff Statement Fees, PHH violated section 1692f(1) of the FDCPA as to Plaintiff Smith and the Class.

104.    Payoff Statement fees are not "expressly authorized by the agreement creating the debt," namely, the Smith Mortgage Agreement.

105.    Payoff Statement fees are not permitted by law, and are in fact prohibited by law.

106.    Accordingly, as a result of PHH's violations of 15 U.S.C. § 1692f(1), Plaintiff Smith and members of the Class suffered harm and are entitled to actual and statutory damages under 15 U.S.C. § 1692k, together with reasonable attorneys' fees and costs.

## COUNT II

## VIOLATIONS OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT

### Payoff Statement Fees

### D.C. Code § 28-3901 *et seq.*

### (On Behalf of Plaintiff Smith and the D.C. Payoff Statement Fee Class)

107.    Plaintiff Smith incorporates the foregoing paragraphs as fully set forth herein.

108.    Plaintiff Smith and members of the D.C. Payoff Statement Fee Class are "consumer[s]" within the meaning of the CPPA. D.C. Code § 28-3901(a)(2).

109.    Defendant engaged in the following unlawful trade practices in violation of the CPPA by assessing Payoff Statement Fees not authorized by Plaintiff's Uniform Mortgage. Defendant's unlawful trade practices include, but are not limited to:

a. Misrepresenting expressly or by implication that it was authorized under either the Uniform Mortgage documents or statute to collect Payoff Statement Fees, in violation of D.C. Code §§ 28-3904(e), (e-1), and (f-1).

b. Failing to inform Plaintiffs and Class Members that it was not authorized to collect Payoff Statement Fees, in violation of D.C. Code §§ 28-3904(f).

c. Failing to disclose that the cost to process a payoff statement request is far below the amount it charges in Payoff Statement Fees, in violation of D.C. Code §§ 28-3904(f).

110.    The CPPA also broadly prohibits unfair acts. *See* D.C. Code § 28-3904. PHH's practice of charging Payoff Statement Fees is an unfair trade practice, in that (a) Plaintiffs and class members could not choose their mortgage loan servicer, and thus, could not avoid paying these charges when requesting a basic service such as a payoff statement; (b) the practice is substantially injurious, oppressive, and harmful to consumers, in that PHH charges borrowers $30 for a payoff statement when its out of pocket costs are likely far less, and in so doing, PHH takes advantage of borrowers' financial vulnerabilities and otherwise upcharges a captive audience; and (c) there is no commensurate benefit to consumers, as the offering of payoff statements to borrowers does not turn on PHH's ability to charge $30 for them, and PHH is required to still offer the service for free. See 15 U.S. Code § 1639(g) (stating "a creditor of servicer of a home loan shall send an accurate payoff balance within a reasonable time, but in no case more than 7 business days, after the receipt of a written request for such balance from or on behalf of the borrower:")

111.   Accordingly, as a result of PHH's violations of the CPPA, Plaintiff Smith and members of the Class suffered harm and are entitled to actual, treble, and/or statutory damages under D.C. Code § 28-3905(k), together with reasonable attorneys' fees and costs.

## COUNT III

## VIOLATIONS OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT

### Pay-to-Pay Fees

### D.C. Code § 28-3901 *et seq.*

### (On Behalf of Plaintiffs and the D.C. Pay-to-Pay Fee Damages Class)

112.   Plaintiffs incorporate the foregoing paragraphs as fully set forth herein.

113.   Plaintiffs and members of the D.C. Class are "consumer[s]" within the meaning of the CPPA. D.C. Code § 28-3901(a)(2).

114.   Defendant engaged in the following unlawful trade practices in violation of the CPPA by assessing Payoff Statement and Pay-to-Pay Fees not authorized by Plaintiff's Uniform Mortgage. Defendant's unlawful trade practices include, but are not limited to:

    a.   Misrepresenting expressly or by implication that it was authorized under either the Uniform Mortgage documents or statute to collect Pay-to-Pay Fees, in violation of D.C. Code §§ 28-3904(e), (e-1), and (f-1).

    b.   Misrepresenting that the Note Amendment was a valid and enforceable amendment to Plaintiffs' Mortgage Agreements.

    c.   Failing to inform Plaintiffs and Class Members that it was not authorized to collect Pay-to-Pay Fees, in violation of D.C. Code §§ 28-3904(f).

    d.   Failing to disclose that the cost to process a phone or web EFT is far below the amount it charges in Pay-to-Pay Fees, in violation of D.C. Code §§ 28-3904(f).

e.  Violating the MLBA, as set forth in Count V, a violation of a law of the district," actionable under the CPPA pursuant to D.C. Code § 28-3905(k)(1)(A).

115.  PHH's practice of charging Pay-to-Pay Fees is an unfair trade practice, in that (a) Plaintiffs and class members could not choose their mortgage loan servicer; (b) the practice is substantially injurious, oppressive, and harmful to consumers, in that PHH charges borrowers $7.50 or $15 for each phone or web payment, often on a monthly basis, when its out of pocket costs are likely far less, and in so doing, PHH takes advantage of borrowers' financial vulnerabilities and otherwise upcharges a captive audience; and (c) there is no commensurate benefit to consumers, as the offering of phone or web payment options to borrowers does not turn on PHH's ability to charge for them, and in fact, costs PHH substantially less than the payments by mail that it is required to accept.

116.  Accordingly, as a result of PHH's violations of the CPPA, Plaintiffs and members of the Class suffered harm and are entitled to actual, treble, and/or statutory damages under D.C. Code § 28-3905(k), together with reasonable attorneys' fees and costs.

**COUNT IV**

**VIOLATION OF THE D.C. MORTGAGE LENDER AND BROKER ACT**

**(On Behalf of Plaintiffs, the D.C. Payoff Statement Fee Class and the D.C. Pay-to-Pay Fee Damages Class)**

117.  Plaintiffs incorporate the foregoing paragraphs as fully set forth herein.

118.  Plaintiffs are "borrowers" as defined in the MLBA. D.C. Code § 26-1101(1).

119.  Plaintiffs' loans were "mortgage loans" as defined in the MLBA. Id. § 26-1101(12).

120.  PHH is a "mortgage lender" as defined in the MLBA. D.C. Code § 26-

1101(11)(A)(iii).

121.    PHH is not a financial institution that accepts deposits or is regulated under Title 26 of the D.C. Code. § 26-1102.

122.    PHH employed a scheme to mislead borrowers and engaged in a deceptive practice by assessing Payoff Statement Fees and Pay-to-Pay Fees not authorized under the terms of the Uniform Mortgage Agreements, in violation of D.C. Code § 26-1114(1).

123.    PHH violated the MLBA when it employed a scheme to mislead borrowers and engaged in a deceptive practice by failing to disclose that the costs for Defendant  to process EFT payments made by phone or internet and to process payoff quote statements are well below the amount of the fees that it charges its borrowers for those transactions, in violation of D.C. Code § 26-1114(2).

124.    Accordingly, as a result of PHH's violations of the MLBA, Plaintiffs and members of the Class suffered harm and are entitled to damages, restitution and/or injunctive relief.

## COUNT V

## VIOLATION OF THE D.C. STATUTE OF FRAUDS

### Seeking Declaratory and Injunctive Relief

### (On Behalf of Plaintiff Smith and the D.C. Pay-to-Pay Fee Declaratory Judgment Class)

1.    Plaintiff Smith incorporates the foregoing paragraphs as though fully set forth herein.

2.    The D.C. Statute of Frauds requires that agreements, memoranda or notes thereof, concerning real estate must be in writing and signed by the party to be charged therewith or a person authorized by them. D.C. Code Ann. § 28-3502.

3.    In *McWhorter v. Ocwen Loan Servicing, LLC*, Case No. 2:15-CV-01831-MHH, 2019 WL 9171207 (N.D. Ala. Aug. 1, 2019), the court approved a settlement including a "Note Amendment" purporting to amend the loan documents of class members whose loans were serviced by PHH's predecessor in interest Ocwen as early as June 1, 2018, to expressly authorize Ocwen to accept Pay-to-Pay Fees.

4.    The Note Amendment is an agreement concerning real estate, and accordingly required the signature of *McWhorter* class members or a person authorized by class members.

5.    Plaintiff Smith did not sign the Note Amendment, and *McWhorter* class counsel was not validly authorized by Plaintiff Smith to sign the Note Amendment on his behalf.

6.    Accordingly, the Note Amendment does not satisfy the requirements of the D.C. Statute of Frauds and is unenforceable against Plaintiff Smith.

7.    An actual, present and justiciable controversy has arisen between Plaintiff Smith and Class Members and PHH concerning the validity of the Note Amendment.

8.    Plaintiff Smith and members of the D.C. Pay-to-Pay Fee Declaratory Judgment Class therefore request a declaration that the Note Amendment is unenforceable against them and enjoining PHH for further collection of Pay-to-Pay Fees. Judicial declarations in this regard are necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to one another.

## COUNT VI

## VIOLATION OF THE D.C. MORTGAGE LENDER AND BROKER ACT

### Seeking Declaratory Relief

### (On Behalf of Plaintiff Smith and the D.C. Pay-to-Pay Fee Declaratory Judgment Class)

9.  Plaintiff Smith incorporates the foregoing paragraphs as fully set forth herein.

10. Plaintiff is a "borrower" as defined in the MLBA. D.C. Code § 26-1101(1).

11. Plaintiff's loans were "mortgage loans" as defined in the MLBA. Id. § 26-1101(12).

12. PHH is a "mortgage lender" as defined in the MLBA. Id. § 26-1101(11)(A)(iii).

13. PHH is not a financial institution that accepts deposits or is regulated under Title 26 of the D.C. Code. Id. § 26-1102.

14. DCMR § 26-C11, a regulation falling under the MLBA, authorizes only "fees that are reasonable and for services actually performed by the licensee or a third party providing services on behalf of the licensee." Id. § C1118.2. The *McWhorter* Note Amendment violates the MLBA because it purports to authorize PHH to charge unreasonable fees that do not correlate with an actual service rendered by PHH, in violation of DCMR § 26-C11.

15. An actual, present and justiciable controversy has arisen between Plaintiffs and Class Members and PHH concerning the validity of the Note Amendment and the legality of the relevant fees under the MLBA.

16. Plaintiff Smith and members of the D.C. Pay-to-Pay Fee Class therefore request a declaration that the Note Amendment, to the extent that it was validly executed, is unenforceable against Plaintiff because it is an illegal under the MLBA, and that the Court enjoin further efforts by PHH to collect Pay-to-Pay Fees. Judicial declarations in this regard are necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to one another.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.      An order certifying the proposed class pursuant to Federal Rule of Civil Procedure 23 and appointing Plaintiffs and their counsel to represent them;

2.      Monetary and/or equitable relief in an amount to be determined at trial;

3.      Statutory damages and/or penalties, including treble damages;

4.      Punitive or exemplary damages;

5.      Pre- and post-judgment interest to the extent provided by law;

6.      Attorneys' fees and costs of suit, including costs of notice, administration, and expert fees; and

7.      Awarding injunctive relief as requested herein;

8.      Awarding declaratory relief as requested herein;

9.      Such other legal or equitable relief as the Court may deem appropriate.

## PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.


Dated: February 7, 2025                                    Respectfully submitted,

                                                          */s/ Amy E. Norris*
                                                          Amy E. Norris (DC Bar  No. 1017140)
                                                          NORRIS LAW GROUP, PLLC
                                                          616 E Street N.W., Suite 1156
                                                          Washington, DC 20004
                                                          Phone.: 202-830-1225
                                                          amy@norrislawgroup.org

                                                          Courtney L. Weiner (DC Bar No. 992797)
                                                          Law Office of Courtney Weiner PLLC
                                                          1629 K Street, NW, Suite 300
                                                          Washington, D.C. 20006
                                                          Phone: (202) 827-9980
                                                          Fax: (202) 792-7806
                                                          cw@courtneyweinerlaw.com

                                                          ***Attorneys for Plaintiffs***